1

2

3

4

5

6

7

8                              UNITED STATES DISTRICT COURT

9                             EASTERN DISTRICT OF CALIFORNIA

10

11    TOMMY WILLIAM CROSS,                      No.  1:17-cv-00877-LJO-SKO HC

12                        Petitioner,

13         v.                                    **FINDINGS AND RECOMMENDATIONS**
                                                 **TO DENY PETITION FOR WRIT OF**
14    KAMALA HARRIS, Attorney General;           **HABEAS CORPUS AND DECLINE TO**
      KATHLEEN L.  DICKERSON, Director;          **ISSUE CERTIFICATE OF**
15    and CYNTHIA TAMPKINS, Warden,              **APPEALABILITY**

16                        Respondents.           **(Doc. 1)**

17

18           Petitioner, Tommy William Cross, is a state prisoner proceeding *pro se* with a petition for

19    writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner alleges one ground for habeas relief:

20    violation of his Fourteenth Amendment rights pursuant to *Brady v. Maryland*.[1]  The Court referred

21    the matter to the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1) and Local Rules 302 and 304.

22    Having reviewed the record as a whole and applicable law, the undersigned recommends that the

23    Court deny the habeas petition.

24

25

26

27

28    _____
      [1] *Brady v. Maryland*, 373 U.S. 83 (1963).

## I.    <u>Factual and Procedural Background[2]</u>

On October 9, 2013, around 2:30 or 3:00 p.m., Randall Ryan Beasley ("Beasley") and Andrea Vernon ("Vernon") entered Oak Lane Liquor, located in Bakersfield, California, and began taking liquor bottles from the display shelves. Surjit Singh ("Singh"), the store owner, grabbed Vernon, who was filling her purse with bottles. Beasley yelled, "Don't touch my lady, motherfucker." Singh grabbed a baseball bat from the counter, but was confronted by Beasley, who placed one of two whiskey bottles he was holding next to Singh's head and said, "If you move, I'm going to blow your head off." Beasley and Vernon fled with approximately 10 bottles.

Singh called 911 and told the dispatcher Beasley, an African-American man, and Vernon, an African-American woman, "stole [his] liquor," "tried to fight [him]," and "grabbed [his] neck," but "didn't hit [him]." He also stated Beasley "want[ed] to hit [him] with [a] bottle." Singh stated he "called 911" "a couple of days ago" but "nobody came." The dispatcher replied, "nobody's going to come for this. We're going to give the information to the officers that are in the area. And then somebody's going to call you over the phone to give you a report."[3] At approximately 9:30 p.m., an officer arrived at the store and took Singh's statement. Singh reiterated that Beasley and Vernon used force, but he did not report they used any firearms.

At trial, the officer testified that upon his arrival at the liquor store on October 9, 2013, Singh remarked, "It took you guys so long to get here . . . ." Singh reported he was already behind the counter when Beasley and Vernon entered the store. When Singh confronted the pair, Beasley grabbed a bottle, "held it over his head" "[a]s if he was going to hit [Singh] with it," and "cornered [Singh]," which allowed Vernon to take more bottles unimpeded. Singh did not say that Beasley held two bottles and threatened to "blow his head off" or that either Beasley or Vernon touched

---

[2] The factual background, taken from the opinion of the California Court of Appeal, Fifth Appellate District, *People v. Cross*, (F069258) (Cal. App. 5th Oct. 5, 2016), is presumed to be correct. 28 U.S.C. § 2254(e)(1).
[3] The jury listened to an audio recalling of this call.

2

him. The officer did not see any signs of a struggle inside the store.

On October 10, 2013, at approximately 3:00 p.m., Singh was assisting a female customer when he saw Beasley, Vernon, and Petitioner approaching the store. He attempted to block the entrance, but Beasley and Vernon pushed the doors open, causing him to stumble backwards. As Petitioner and Vernon were filling a duffel bag with liquor bottles, Singh went to the counter for his phone and bat. According to Singh, Beasley pointed a gun at his head and warned, "If you call the police, I'm going to blow your head off. . . . Motherfucker, if you move, I'm going to blow your head off."[4] Singh testified he was afraid, "start[ed] shaking," and "didn't move." Meanwhile, the female customer tried to stop Vernon, but Vernon shoved her. Petitioner and Vernon left the store once they filled the duffel bag. Beasley followed, after taking two more bottles.

Singh grabbed his phone, went outside, and spotted the three next to a car. Petitioner placed the duffel bag in the trunk. As they were driving off, Singh called 911 and told the dispatcher the "same people stole [his] liquor again" and "they got a gun to[o]." Singh described Petitioner as a Caucasian male and the getaway vehicle as a gray four-door Chevrolet Impala. He provided the license plate number and stressed he "called [911 at the] same time yesterday" and Beasley and Vernon "did the same thing yesterday."[5]

In response to the robbery call, at approximately 5:20 p.m., two officers drove around the area of the liquor store looking for Petitioner, Beasley, and Vernon. The officers found them approximately one and one-half miles southeast of the store in a gray four-door Honda Accord. Petitioner was the driver, Beasley was the front passenger, and Vernon was in the rear seat. One of the officers testified the trio "appeared to be looking directly at [the] patrol vehicle" and "appeared agitated and nervous . . . by [the officers'] presence."

---

[4] Singh also testified the female customer exclaimed, "They got a gun. They got a gun."
[5] The jury listened to an audio recording of this call.

3

A license plate check showed the vehicle was reported stolen. When officers approached Petitioner, Beasley, and Vernon, they were standing near the vehicle and began walking away from it. The officers ordered them to stop and detained Beasley and Vernon without incident. Petitioner resisted arrest and was found with a fixed-blade knife.

The Honda Accord was still running when the officers arrested Beasley, Vernon, and Petitioner, but it did not have a key in the ignition. A search of the vehicle revealed a duffel bag filled with approximately 16 bottles of alcohol. The police also found two vodka bottles in Vernon's purse. A firearm was not found.

During an interview at his liquor store, Singh stated Beasley, Vernon, and Petitioner pushed the door open. Immediately thereafter, Beasley took out his gun, pointed it at Singh's head, and directed Singh to stay behind the cash register. Beasley threatened to "blow [Singh's] head off" if Singh touched anything. As Beasley was leaving the store, he taunted Singh, stating "Go ahead and call the police because they're not going to come."

An officer transported Singh to the location of Beasley, Vernon, and Petitioner's arrest for an infield show-up. Singh identified the three as the culprits. Singh also recognized the getaway vehicle,[6] the duffel bag, and the alcohol bottles taken from his store

When questioned about how he came into possession of the Honda Accord, Petitioner claimed a stranger gave him the car and car keys for free when he was walking that morning.[7] The owner of the vehicle had reported it missing on October 8, 2013. The owner did not know Petitioner or allow him to use the vehicle.

---

[6] Singh testified the Honda Accord was the getaway vehicle based on the color and license plate number. When he saw the car for the first time on October 10, 2013, he could not see the Honda logo.

[7] The jury listened to an audio recording of the interview.

At trial, Singh acknowledged that he was previously convicted of selling tobacco to a minor. (Cal. Penal Code § 308(a)) in 2008 and 2012.

A 911 dispatcher testified at trial that dispatchers prioritized 911 calls in the following manner:

> [I]f someone's life is in danger, it's priority one. If no one's life is in danger and it isn't cause for immediate police response or medical or fire, it's usually a two. Animal calls are categorized as priority three, and all [other] reports are priority four unless your life was threatened."

Armed robbery, for instance, warranted a priority one call.

On October 7, 2013, the dispatcher received a "petty theft" call from Singh in which Singh claimed an African-American prostitute tried to steal a whiskey bottle.[8] In Singh's second 911 call on October 9, 2013, Singh said, "I called [911] two times . . . two days ago and today." The dispatcher replied, "We have it as a petty theft report. An officer is supposed to call you back to take the report over the phone."[9]

Defendants were jointly charged with burglary of a liquor store (Cal. Penal Code § 460(b), [count 5]); criminal threats (Cal. Penal Code § 422, [count 6]); and robbery (Cal. Penal Code § 212.5(c), [count 7]) on or around October 10, 2013. Petitioner was also charged with unlawfully driving or taking a vehicle without the vehicle owner's consent (Cal. Veh. Code § 10851(a), [count 1]) between October 7 and 10, 2013; receiving a stolen vehicle (Cal. Penal Code § 496d(a), [count 2]); carrying a concealed dirk or dagger (Cal. Penal Code § 21310, [count 8]); and resisting, delaying, or obstructing a peace officer (Cal. Penal Code § 148(a)(1), [count 9]) on or around October 10, 2013.

It was further alleged in counts 1, 2, and 5 through 8, that Petitioner had served four prior prison terms (Cal. Penal Code § 667.5(b)), and in counts 5 through 7, Petitioner was alleged to have

---

[8] The jury listened to an audio recording of the call.
[9] The jury listened to an audio recording of the call.

known Beasley was personally armed (Cal. Penal Code § 12022(d)).

Before trial, at the prosecution's request, the trial court dismissed count 6, making criminal threats. The trial court also bifurcated the recidivist enhancement allegations.

Petitioner's attorney did not dispute liquor bottles were taken from Singh's store. However, the attorney questioned the veracity of Singh, the prosecution's key witness. The attorney theorized Singh lied to the 911 dispatcher about Beasley possessing a firearm on October 10, 2013, to elicit a faster response from law enforcement. The attorney also highlighted Singh's repeated convictions for selling tobacco to a minor, and his inconsistent statements about what exactly transpired on October 9 and 10.

On January 27, 2014, the jury found Petitioner guilty on the substantive offenses, but was evenly split on the firearm enhancement allegations. At the prosecution's request, the trial court dismissed these allegations. In the bifurcated proceeding, the court found true the recidivist enhancement allegations.

Petitioner received an aggregate sentence of 10 years, 4 months: (1) 9 years on count 7, comprised of an upper term of 5 years plus 4 years for the four prior prison terms; (2) 8 months on count 1; (3) 8 months on count 8; and (4) a concurrent 139 days on count 9. The trial court stayed execution of punishment on counts 2 and 5.

Singh was arrested on February 7, 2014, as part of a sting operation.

On March 5, 2014, Petitioner filed a motion for a new trial, claiming the prosecution violated *Brady* by withholding evidence and undermining the credibility of Singh, specifically that Singh was arrested. At the March 27, 2014 motion hearing, Detective Lonnie Mills ("Mills") of the Bakersfield Police Department's vice unit testified. Mills testified that his sergeant was contacted by a local supermarket's supervising loss prevention agent in August or September 2013, stating some of the supermarket's alcohol products were on display at Singh's liquor store. The

vice unit commenced a three-day sting operation, which took place on January 24, February 5, and February 7, 2014. On those days, undercover vice officers sold Singh what were represented to be stolen liquor bottles.

On April 1, 2014, the trial court denied the motion for a new trial based on the evidence that Singh had been arrested on February 7, 2014. Specifically, the trial court held:

> (1) the vice unit was not part of the "'prosecution team'"; (2) any information known to the vice unit before January 24, 2014, was not exculpatory; and (3) any information known to the vice unit after January 24, 2014, was not material. Regarding the third point, the court reasoned:

> "In the instant case, the Court had already allowed the defendants to impeach Mr. Singh's credibility with [two] misdemeanor convictions for selling tobacco to minors. The entire thrust of the defense of all [three] codefendants was to attack Mr. Singh's credibility, particularly his testimony that [Beasley] w[as] armed with a firearm. Even without the evidence which is the subject of these motions, [d]efendants' attacks on Mr. Singh's credibility were substantially successful, resulting in [six] jurors having a reasonable doubt with respect to the firearm component. Nevertheless, all 12 jurors were able to find [d]efendants guilty on the other charges because of the overwhelming amount of evidence[,] including the fact that defendants were found in the vicinity, shortly after the robbery, in a stolen car and in possession of inventory belonging to the victim.
> "There is absolutely no reason to believe that the jur[ors] would have decided otherwise if they had been exposed to unadjudicated accusations that . . . Mr. Singh had purchased allegedly stolen liquor while they were deliberating."

The California Court of Appeal ("Court of Appeal") affirmed the judgment on October 5, 2016. On January 11, 2017, the California Supreme Court summarily denied review.

Petitioner filed his petition for writ of habeas corpus with this Court on July 5, 2017. Respondent filed a response on September 11, 2017.

## II.    Standard of Review

A person in custody as a result of the judgment of a state court may secure relief through a petition for habeas corpus if the custody violates the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); *Williams v. Taylor*, 529 U.S. 362, 375 (2000). On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which

7

applies to all petitions for writ of habeas corpus filed thereafter. *Lindh v. Murphy*, 521 U.S. 320, 322-23 (1997). Under the statutory terms, the petition in this case is governed by AEDPA's provisions because it was filed April 24, 1996.

Habeas corpus is neither a substitute for a direct appeal nor a device for federal review of the merits of a guilty verdict rendered in state court. *Jackson v. Virginia*, 443 U.S. 307, 332 n. 5 (1979) (Stevens, J., concurring). Habeas corpus relief is intended to address only "extreme malfunctions" in state criminal justice proceedings. *Id.* Under AEDPA, a petitioner can obtain habeas corpus relief only if he can show that the state court's adjudication of his claim:

>    (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

>    (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *Lockyer v. Andrade*, 538 U.S. 63, 70-71 (2003); *Williams*, 529 U.S. at 413.

"By its terms, § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions set forth in §§ 2254(d)(1) and (d)(2)." *Harrington v. Richter*, 562 U.S. 86, 98 (2011).

As a threshold matter, a federal court must first determine what constitutes "clearly established Federal law, as determined by the Supreme Court of the United States." *Lockyer*, 538 U.S. at 71. In doing so, the Court must look to the holdings, as opposed to the dicta, of the Supreme Court's decisions at the time of the relevant state-court decision. *Id.* The court must then consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." *Id.* at 72. The state court need not have cited clearly established Supreme Court precedent; it is sufficient that neither the reasoning nor the result of the state court contradicts it. *Early v. Packer*, 537 U.S. 3, 8 (2002). The federal court

must apply the presumption that state courts know and follow the law. *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). The petitioner has the burden of establishing that the decision of the state court is contrary to, or involved an unreasonable application of, United States Supreme Court precedent. *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996).

"A federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Lockyer*, 538 U.S. at 75-76. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Thus, the AEDPA standard is difficult to satisfy since even a strong case for relief does not demonstrate that the state court's determination was unreasonable. *Harrington*, 562 U.S. at 102.

### III. The State Court Did Not Err in Denying Petitioner's Fourteenth Amendment Claim

Petitioner contends the prosecution suppressed material evidence, violating his due process rights pursuant to the duties established in *Brady v. Maryland*, 373 U.S. 83 (1963). Specifically, Petitioner alleges the prosecution failed to timely reveal to the defense that the liquor store owner and prosecution witness, Singh, was the subject of a sting operation undertaken by the Vice Unit of the Bakersfield Police Department on January 24, 2014, which resulted in his later arrest. (Doc. 1 at 22.) Respondent counters the Court of Appeal's rejection of Petitioner's claim was reasonable. (Doc. 12 at 17.)

#### A. Standard of Review

A defendant has the right to request and obtain from the prosecution evidence that is either material to the guilt of the defendant or relevant to the punishment imposed. *Brady*, 373 U.S. at 87. Even in the absence of a specific request, the prosecution has a constitutional duty to turn over

exculpatory evidence that would raise a reasonable doubt about a defendant's guilt. *United States v. Agurs*, 427 U.S. 97, 112 (1976). This disclosure duty extends to evidence that the defense might use to impeach a prosecution witness. *United States v. Bagley*, 473 U.S. 667, 676 (1985).

"[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Id.* at 682. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

To establish a *Brady* violation undermines a conviction, Petitioner must show: "(1) the evidence at issue is 'favorable to the accused, either because it is exculpatory, or because it is impeaching'; (2) the State suppressed the evidence, 'either willfully or inadvertently'; and (3) 'prejudice . . . ensued.'" *Skinner v. Switzer*, 562 U.S. 521, 536 (2001) (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)).

## B. <u>State Court of Appeal Opinion</u>

The Court of Appeal determined the trial court did not violate *Brady* in failing to provide the defense with information about the liquor store owner, Singh:

> b.    *Standard of review.*
>
> An appellate court independently reviews the question of whether a Brady violation occurred, but affords great weight to a trial court's factual findings that are supported by substantial evidence. (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 176; *People v. Salazar* (2005) 35 Cal.4th 1031, 1042 (*Salazar*); see *People v. Johnson* (1980) 26 Cal.3d 557, 576 ["Evidence, to be 'substantial' must be 'of ponderable legal significance . . . reasonable in nature, credible, and solid value.'"].)
>
> c.    *Analysis.*
>
> Under the due process clause of the Fourteenth Amendment, as interpreted by the United States Supreme Court in *Brady* and *Brady*'s progeny, a prosecutor must disclose evidence that is favorable to a criminal defendant, notwithstanding the prosecutor's good faith and the defendant's failure to request such disclosure. (*People v. Williams* (2013) 58 Cal.4th 197, 255-256; *Salazar*, *supra*, 35 Cal.4th at p. 1042; *People v. Superior Court (Meraz)* (2008) 163 Cal.App.4th 28, 47.) "Evidence is 'favorable' if it either helps the defendant or hurts the prosecution, as by impeaching one of its witnesses." (*In re Sassounian* (1995) 9 Cal.4th 535, 544 (*Sassounian*); accord, *People v. Ruthford* (1975) 14 Cal.3d 399, 408 ["We conclude

10

that the suppression of substantial material evidence bearing on the credibility of a key prosecution witness is a denial of due process within the meaning of the Fourteenth Amendment.'], overruled in part by *Sassounian*, *supra*, at p. 545, fn. 7.) If such evidence is suppressed and prejudice ensues, then a *Brady* violation occurs. (*Salazar*, *supra*, 35 Cal.4th at p. 1043.)  in this context, prejudice "focuses on 'the materiality of the evidence to the issue of guilt or innocence'" (*Salazar*, *supra*, at p. 1043), which requires the defendant to "'show a "reasonable probability of a different result"'" (*ibid*.).

In sum, "[t]here are three components of a . . . *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." (*Strickler v. Greene* (1999) 527 U.S. 263, 281-282; accord, *Salazar*, *supra*, 35 Cal.4th at p. 1043.)

With respect to the information known to the vice unit before January 24, 2014, we find this information was not favorable to defendants. Mills testified there was no evidence of incriminating conduct until the first day of the sting operation. (See *People v. Mena* (2012) 54 Cal.4th 146, 160 [nonexistent evidence cannot be either favorable or material]; see also *People v. Barnwell* (2007) 41 Cal.4th 1038, 1052 [testimony of a single witness may constitute substantial evidence].)

With respect to the information known to the vice unit on and after January 24, 2014, we find this information was immaterial.
"The materiality of undisclosed information which could have served to impeach a government witness is affected by the importance of the witness's testimony, as well as the importance of the [un]disclosed information to the impeachment of the witness." (*U.S. v. Spinelli* (2d Cir. 2008) 551 F.3d 159, 165.) [fn.12]  "Impeaching information is more likely to be deemed material 'if the witness whose testimony is attacked supplied the only evidence linking the defendant[ ] to the crime.'  [ ]" (*U.S. v. Spinelli*, *supra*, at p. 165.)  However, "if the information withheld is merely cumulative of equally impeaching evidence introduced at trial, so that it would not have materially increased the jury's likelihood of discrediting the witness, it is not material." (*Ibid*.; accord, *U.S. v. Paladin* (1st Cir. 2014) 748 F.3d 438, 446; *U.S. v. Brodie* (D.C. Cir. 2008) 524 F.3d 259, 268-269; *U.S. v. Dweck* (7th Cir. 1990) 913 F.2d 365, 371; *U.S. v. Polizzi* (9th Cir. 1986) 801 F.2d 1543, 1553.)  Undisclosed impeachment evidence is cumulative "where the defendant already had available to him evidence that would not have allowed for impeachment on the same or similar topics." (*U.S. v. Paladin*, *supra*, 748 F.3d at p. 447; cf. *Maxwell v. Roe* (9th Cir. 2010) 628 F.3d 486, 512 [suppressed impeachment evidence about prosecution witness's plea deal and his experience as jailhouse informant pertained to witness's sophistication and motivation in his capacity as an informant whereas impeachment evidence produced at trial, i.e., lies about his level of education and number of felony convictions, pertained to witness's general propensity for dishonesty].)

[fn.12] Although lower federal court decisions are not binding upon California courts, they are persuasive and entitled to great weight.  (*Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 58; *People v. Cleveland* (2001) 25 Cal.4th 466, 480; *People*

*v. Bradley* (1969) 1 Cal.3d 80, 86.)

Materiality, which is a defendant's burden to establish (*Strickler v. Greene*, *supra*, 527 U.S. at p. 291; *Sassounian*, *supra*, 9 Cal.4th at p. 550), "requires more than a showing that the suppressed evidence would have been admissible [ ], that the absence of the suppressed evidence made conviction 'more likely' [ ], or that using the suppressed evidence to discredit a witness's testimony 'might have changed the outcome of the trial'" (*Salazar*, *supra*, 35 Cal.4th at p. 1043). Instead, a defendant "'must show a "reasonable probability of a different result."'" [ ]" (*Ibid.*) "The requisite 'reasonable probability' is a probability sufficient to 'undermine[ ] confidence in the outcome' on the part of the reviewing court. [ ] It is a probability assessed by considering the evidence in question under the totality of the relevant circumstances and not in isolation or in the abstract. [ ]" (*Sassounian*, *supra*, 9 Cal.4th at p. 53, fn. 12 ["Speculation does not constitute a probability."].)

Here, Singh was the prosecution's sole percipient witness as to the robberies charged on counts 4 and 7, the criminal threat charged on count 6, and the firearm enhancement allegations. [fn.13] The defense prudently contested Singh's credibility. It proposed the theory that Singh, who was unhappy with the response of law enforcement, or lack thereof, to his "petty theft" calls, lied to the 911 dispatcher about Beasley having a firearm on October 10, 2013, to ensure a "priority one" designation. In addition, the jury was made well aware of Singh's inconsistent statements as well as his repeat convictions for selling tobacco to a minor in 2008 and 2012. (Cf. *Amado v. Gonzalez* (9th Cir. 2014) 758 F.3d 1119, 1139) [absent suppressed impeachment evidence about prosecution witness's previous felony conviction, probation status, and prior gang membership, defense solely challenged witness's eyesight on cross-examination].) The jury ultimately deadlocked on the firearm enhancement allegations, evincing its acceptance of the defense's theory. Yet, the jury still convicted defendants on the substantive offenses, meaning it necessarily credited the rest of Singh's testimony, including: (1) during the October 9, 2013, incident, Beasley threatened to injure Singh with whiskey bottles if the latter resisted (see *People v. Morehead* (2011) 191 Cal.App.4th 765, 775 ["[F]ear may be inferred from the circumstances in which the property is taken."]); (2) during the October 10, 2013, incident, Singh tried to barricade the store's entrance, but Beasley and Vernon pushed the doors open, causing Singh to stumble backward (see *People v. Burns* (2009) 172 Cal.App.4th 1251, 1259 ["'"[A]ll the force that is required to make the offense a robbery is such force as is actually sufficient to overcome the victim's resistance . . . ."'"]); and (3) during the October 10, 2013, incident, Beasley repeatedly threatened to injure Singh if the latter attempted to call the police or otherwise move, which made Singh fearful . . . . As the sole judge of credibility, the jury had the prerogative to reject part of Singh's testimony while accepting or believing other portions of his testimony. (*Whitechat v. Guyette* (1942) 19 Cal.2d 428, 434-435; *Lindemann v. San Joaquin Cotton Oil Co.* (1936) 5 Cal.2d 480, 503-504; *People v. Flores* (1968) 267 Cal.App.2d 452, 457; *People v. Harris* (1964) 231 Cal.App.2d 214, 218; *People v. Bodkin* (1961) 196 Cal.App.2d 412, 414.)

[fn.13] Singh's testimony was not significant as to the crimes charged on counts 1, 2, 8, and 9.

. . .

We believe the information known to the vice unit on an after January 24, 2014, i.e., Singh purchased what were represented to be stolen liquor bottles from undercover vice officers on January 24, February 5, and February 7, 2014, and was consequently arrested, was "simply another illustration of [Singh]'s untruthfulness rather than evidence 'almost unique in its detrimental effect' on [Singh]'s credibility" (*U.S. v. Brodie*, *supra*, 524 F.3d at p. 269) and thus cumulative of the evidence of Singh's repeat convictions introduced at trial. Accordingly, we conclude defendants failed to establish a probability sufficient to undermine confidence in the jury's verdict. A Brady violation did not occur. [fn.14]

[fn.14] We recognize the parties extensively briefed the issue of whether the vice unit was part of the "'prosecution team'" and therefore subject to the *Brady* rule. We need not decide this issue since we dispose of defendants' claim of a *Brady* violation on other grounds. (See, e.g., *People v. Clark* (2011) 52 Cal.4th 856, 982.)

*People v. Cross*, (F069258) (Cal. App. 5th Oct. 5, 2016), at 8-15.

## C. <u>Denial of Petitioner's Fourteenth Amendment Claim Was Not Objectively Unreasonable</u>

As outlined above, there are three components of a *Brady* violation: "(1) the evidence at issue is 'favorable to the accused, either because it is exculpatory, or because it is impeaching'; (2) the State suppressed the evidence, 'either willfully or inadvertently'; and (3) 'prejudice ... ensued.'" *Skinner*, 562 U.S. at 536 (quoting *Strickler*, 527 U.S. at 281–82). Assuming the second component has been demonstrated, Petitioner must satisfy the other two components.

The evidence at issue, that Singh was the subject of a 2014 sting operation, was "favorable" to Petitioner, because evidence impeaching the testimony of a government witness falls within the *Brady* rule. *United States v. Brumel-Alvarez*, 991 F.2d 1452, 1458) (9th Cir. 1992) ("Evidence impeaching the testimony of a government witness falls within the *Brady* rule when the reliability of the witness may be determinative of a criminal defendant's guilt or innocence.") (citing *Giglio v. United States*, 405 U.S. 150, 154 (1972)). Respondent does not appear to dispute that the evidence was "favorable" to Petitioner; consequently, Petitioner also satisfies the first *Brady*

13

component.

Respondent disputes the third *Brady* component, contending that the information regarding Singh was not material, "because it did not 'put the whole case in a different light as to undermine the confident in the outcome.'" (Doc. 12 at 16.) (quoting *Kyler v. Whitley*, 514 U.S. 419, 434-35 (1995)).

The Court agrees with Respondent's assessment that the information that Singh was the subject of a sting operation was not material. Indeed, the Supreme Court has stated it "do[es] not . . . automatically require a new trial whenever 'a combing of the prosecutor's files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict.'" *Bagley*, 473 U.S. 667, 677 (quoting *Giglio*, 405 U.S. at 154).

Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682. Here, the jury heard about Singh's inconsistent statements regarding the robberies and his two convictions for selling tobacco to a minor in 2008 and 2012. *Cross*, (F069258), at 14. Further, the defense contested Singh's credibility by theorizing he lied to the 911 dispatcher about Beasley having a firearm on October 10, 2013, in order to be considered a higher priority to police officers. *Id*.

Evidence that Singh was the subject of a sting operation on the suspicion that he was selling stolen liquor would have highlighted Singh's untruthfulness. However, the additional evidence of Singh's dishonest nature would not have affected the jury when this had been firmly established through the other evidence presented at trial. This withheld evidence did not provide "the defense with a new and different ground of impeachment." *Benn v. Lambert*, 283 F.3d 1040, 1056 (9th Cir. 2002). Instead, the withheld evidence was cumulative of the evidence presented at trial. For the forgoing reasons, the Court recommends denying Petitioner's claim.

## IV.     Certificate of Appealability

A petitioner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, but may only appeal in certain circumstances.  *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003).  The controlling statute in determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides:

> (a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.

> (b)  There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.

> (c)   (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—

>> (A)   the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or

>> (B)  the final order in a proceeding under section 2255.

> (2)  A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

> (3)  The certificate of appealability under paragraph (1) shall indicate which specific issues or issues satisfy the showing required by paragraph (2).

If a court denies a habeas petition, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El*, 537 U.S. at 327; *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Although the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his  . . .  part."  *Miller-El*, 537 U.S. at 338.

Reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief to be debatable or wrong, or conclude that the issues presented required further adjudication. Accordingly, the Court recommends declining to issue a certificate of appealability.

## V.   **Conclusion and Recommendation**

Based on the foregoing, the undersigned recommends that the Court deny the Petition for writ of habeas corpus with prejudice and decline to issue a certificate of appealability.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C § 636(b)(1). Within **thirty (30) days** after being served with these Findings and Recommendations, either party may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Replies to the objections, if any, shall be served and filed within **fourteen (14) days** after service of the objections. The parties are advised that failure to file objections within the specified time may constitute waiver of the right to appeal the District Court's order. *Wilkerson v. Wheeler*, 772 F.3d 834, 839 ((9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).


IT IS SO ORDERED.

Dated:   __**September 21, 2018**__                    _____/s/ *Sheila K. Oberto*_____
                                                             UNITED STATES MAGISTRATE JUDGE

16